**APPEAL NUMBER: 24-10657-B**

---

IN THE UNITED STATES COURT OF APPEALS
11TH CIRCUIT

---

**UNITED STATES,**
**APPELLEE,**

v.

**LESLEY C. GREEN,**
**DEFENDANT-APPELLANT.**

APPEAL FROM THE UNITED DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
THE HONORABLE MARC T. TREADWELL

DISTRICT COURT NO. 3:22-CR-00014-MTT

---

**BRIEF OF APPELLANT**

---

M. ERIC EBERHARDT
EBERHARDT & HALE, LLP
1160 S. MILLEDGE AVENUE, SUITE 120
ATHENS, GA 30605
(706) 549-1965

ATTORNEY FOR APPELLANT
LESLEY C. GREEN

IN THE UNITED STATES COURT OF APPEALS
11TH CIRCUIT

United States,                    *
    Appellee,                    *    Appeal Number: 24-10657-B
    v.                               *
                                     *
LESLEY C. GREEN,                 *
    APPELLANT.                   *

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The undersigned counsel of record for Defendant-Appellant, LESLEY C. GREEN,

in compliance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26-1, certifies that the following listed persons and parties have an interest in

the outcome of this case:


1.  Eberhardt, M. Eric, Eberhardt & Hale, LLP, Trial and Appellate Counsel;

2.  Green, Lesley C., Defendant-Appellant;

3.  Abt, E. Jay – Attorney for Co-Defendant Shabazz Larry Guidry;

4.  Barrow, Charles – Attorney for Co-Defendant Robert Maurice Carlisle;

5.  Boenig, Markus F – Attorney for Co-Defendant Andrea Paige Browner;

6.  Browner, Andrea Paige – Co-Defendant;

7.  Carlisle, Robert Maurice – Co-Defendant;

8.  Chambers, Philmon Deshawn – Co-Defendant;

9.  Conway, Byron L. – Executive Director, Federal Defenders of the Middle District of Georgia;

10. Dodson, Jonathan R. – Attorney For Co-Defendant Philmon Chambers, Federal Defenders of the Middle District of Georgia;

11. Fitzgerald, Keith Eric – former Attorney for Co-Defendant Shabazz Larry Guidry;

12. Gabriel, Russell C. – former Interim Executive Director, Federal Defenders of the Middle District of Georgia;

13. Gantt, E. Addison – Attorney For Co-Defendant Philmon Chambers;

14. Ghali, Kamal – former Attorney for Co-Defendant Andrea Paige Browner;

15. Guidry, Shabazz Larry – Co-Defendant;

16. Irvin, Felicia of Athens, GA – mother of alleged victim Derrick Ruff, Jr.'s child;

17. Jackson, Gerald of Athens, GA – relative of alleged victim Joshua Jackson;

18. Jackson, Joshua of Athens, GA – alleged victim;

19. Jackson, Stephanie of Athens, GA – relative of alleged victim J. Jackson;

20. Kaplan, Kenneth P. – Department of Justice, Organized Crime and Gang Section, District of Columbia;

21. Leary, Peter D. – United States Attorney, Middle District of Georgia;

22. Morton, Raymond Blake – Trial Attorney for Co-Defendant Philmon Deshawn Chambers;

23. Morrison, Mike – Assistant United States Attorney, Middle District of Georgia;

24. Ruff, Derrick Jr. of Eatonton, GA – alleged victim;

25. Ruff, Derrick Sr. of Eatonton, GA – relative of alleged victim Derrick Ruff, Jr.;

26. Treadwell, Marc T. – Chief Judge, United States District Court, Middle District of Georgia;

27. Walker, Stuart E. – Assistant United States Attorney, Middle District of Georgia;

28. Weigle, Charles H. – United States Magistrate Judge, Middle District of Georgia;

29. Williams, Catherine M. – former Attorney for Co-Defendant Philmon Deshawn Chambers, Federal Defenders of the Middle District of Georgia.


No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for Appellant Lesley C. Green requests oral argument in this case. Counsel contends that the Government's evidence was insufficient to convict, and that several evidentiary errors improperly bolstered the Government's case. Counsel contends oral argument may assist the Court in assessing legal arguments that may not rest on clear precedent. Counsel further contends oral argument may assist the Court and the parties in examining the weight of the evidence to determine whether the evidence was sufficient to convict and whether the evidentiary errors affected the outcome at trial.

## STATEMENT OF TYPE SIZE AND STYLE

Pursuant to Federal Rules of Appellate Procedure 32(a)(5) and (6), counsel for Appellant hereby certifies that the size and style of type used in this brief is Times New Roman 14pt.

i

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS

AND CORPORATE DISCLOSURE STATEMENT ...........................C1of 3

STATEMENT REGARDING ORAL ARGUMENT ....................................i

STATEMENT OF TYPE SIZE AND STYLE.................................................i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES...........................................................iv

STATEMENT OF JURISDICTION ..............................................1

STATEMENT OF THE ISSUE ....................................................2

STATEMENT OF THE CASE .....................................................3

(i)     Course of Proceedings...........................................................3

(ii)    Statement of Facts .................................................................5

(iii)   Standard of Review ..............................................................15

SUMMARY OF THE ARGUMENT ............................................................17

ARGUMENT AND CITATIONS OF AUTHORITY ..................................19

I.   The Government failed to prove all the elements of a Racketeering (RICO) offense under 18 U.S.C. §1962(c) in relation to the deaths of Derrick Ruff and Joshua Jackson; therefore, Appellant's conviction

under Count One of the Indictment (RICO Conspiracy) must be overturned...............................................................................19

II. The Government unlawfully introduced wiretap evidence that had a harmful effect to Appellant Green; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) must be overturned.............24

III. The Government unlawfully introduced statements of Appellant Green's co-defendant Philmon Chambers in violation of the hearsay rules and Appellant Green's Sixth Amendment confrontation rights; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) must be overturned..........................................................................36

IV. The Government unlawfully introduced irrelevant and inflammatory evidence against Appellant Green; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) should be overturned..........41

CONCLUSION.............................................................................47

CERTIFICATE OF COMPLIANCE ...........................................48

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>:

*Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) .........................21

*Bruton v. United States,* 391 U.S. 123 (1968) ...............................................40

*Epps v. St. Mary's Hosp. of Athens, Inc.*, 802 F.2d 412 (11th Cir. 1986) .......31

*Fleming v. United States*, 547 F.2d 872 (5th Cir. 1977)..................................30

*Luangkhot v. State*, 292 Ga. 423, 736 S.E.2d 397 (GA 2013)..................28, 30

*Morton's Market v. Gustafson's Dairy*, 198 F.3d 823 (11th Cir. 1999) .......39

*Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574

(1997) ........................................................................................42, 43, 44

*United States v. Baker, 432 F.3d 1189 (11th Cir. 2005)* ...............................16

*United States v. Bascaro*, 742 F.2d 1335 (11th Cir. 1984)............................25

*United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991) ...............................38

*United States v. Bergman*, 852 F.3d 1046, 1062 (11th Cir. 2017) ..............39

*United States v. Colston, 4 F.4th 1179 (11th Cir. 2021)* ...............................15

*United States v. Dahda*, 138 S.Ct. 1491, 1495, 200 L.Ed.2d 842 (2018)...........

.................................................................................................32, 33, 35

*United States v. Denman, 100 F.3d 399 (5th Cir. 1996)* ..............................32

*United States v. Dickerson*, 248 F.3d 1036 (11th Cir. 2001) .......................38

*United States v. Elliott*, 571 F.2d 880 (5th Cir. 1978)..................................21

*United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.1987)...................39

*United States v. Henley, 766 F.3d 893 (8th Cir. 2014)*  .............................32

*United States v. Giordano*, 416 U.S. 505 (1974) ..............................30, 34, 35

*United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998)...........................25

*United States v. Hill, 643 F.3d 807 (11th Cir. 2011)*.....................................16

*United States v. Jackson, 207 F.3d 910 (7th Cir. 2000)* ..............................32

*United States v. Jackson, 849 F.3d 540 (3d Cir. 2017)* .................................32

*United States v. Jenkins*, 58 F.3d 611 (11th Cir. 1995)  ..............................29

*U.S. v.  Jordan, 635 F.3d 1181 (11th Cir. 2011)*...........................................16

*United States v. Leon,* 468 U.S. 897 (1984) .............................................34, 35

*United States v. Luong, 471 F.3d 1107 (9th Cir. 2006)* ...............................32

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002.) .............................. 35

*United States v. Martino*, 648 F.2d 367 (5th Cir. 1981)................................21

*United States v. McLemore*, 28 F.3d 1160 (11th Cir. 1994) .........................29

*United States v. Moore, 76 F.4th 1355 (11th Cir. 2023)* ...............................15

*United States v. Nelson*, 837 F.2d 1519 (11th Cir. 1988)........................30, 31

*United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992)  ...........................32

v

*United States v. Smith, 459 F.3d 1276 (11th Cir. 2006)*................................16

*United States v. Starrett*, 55 F.3d 1525 (11th Cir. 1995) ........................20, 21

*United States v. Stowers*, 32 F.4th 1054 (11th Cir. 2022) ............................28

*United States v. U.S. Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d

854 (1978) ................................................................................................39

*United States v. Utter*, 97 F.3d 509 (11th Cir. 1996) ....................................44

*United States v. Verdeza, 69 F.4th 780 (11th Cir. 2023)* ..............................15

*United States v. Welch*, 656 F.2d 1039 (5th Cir. Sept. 1981) ......................21

## CONSTITUTIONAL PROVISIONS AND STATUTES:

4th Amendment of U.S. Constitution ..............................................................24

6th Amendment of U.S. Constitution ................................................18, 36, 40

O.C.G.A. §16-11-64 .....................................................................................24

O.C.G.A. §16-11-64(c) ......................................................................25, 26, 29

18 U.S.C. Chapter 119..............................................................................24, 26

18 U.S.C. §§ 1962(c) ....................................................................2, 17, 19, 20

18 U.S.C. §§ 1962(d)..............................................................1, 2, 3, 17, 19

18 U.S.C. §§ 1963(a) ..................................................................................1, 3

18 U.S.C. § 2518(3) ......................................................................................26

18 U.S.C. §2515 ..................................................................................30

18 U.S.C.§ 2510 (4) ...........................................................................33

18 U.S.C.§ 2510 (5) ...........................................................................33

18 U.S.C. §2518(10)(a) ......................................................................35

18 U.S.C.§ 2510 (12) .........................................................................33

18 U.S.C. § 3231 ...................................................................................1

18 U.S.C. § 3232 ...................................................................................1

28 U.S.C. § 1291 ...................................................................................1

## **COURT RULES:**

Eleventh Circuit Rule 26-1 ................................................................C1

Federal Rule of Appellate Procedure (4)b.........................................1

Federal Rule of Appellate Procedure 26.1 .......................................C1

Federal Rules of Appellate Procedure 32(a)(5) and (6) ....................i

Federal Rule of Appellate Procedure 32(a)(7) ................................48

Federal Rule of Criminal Procedure 18............................................1

Federal Rule of Criminal Procedure 29...................................15, 24

Federal Rule of Evidence 401 .................................................2, 41, 42

Federal Rule of Evidence 403 .........................................2, 41, 42, 44

Federal Rule of Evidence 801(d)(2)(E) ...................................................38, 39

## **OTHER AUTHORITIES:**

Webster's Dictionary ......................................................................34

## STATEMENT OF JURISDICTION

Under 18 U.S.C. §3231, 18 U.S.C. §3232, and F.R.C.P. 18, the United States District Court for the Middle District of Georgia had original jurisdiction over the trial portion of this case since Appellant Lesley C. Green was charged with violations of United States laws alleged to occur within the Middle District of Georgia. The superseding indictment charging Lesley C. Green with a single count of RICO Conspiracy under 18 U.S.C. §1962(d) and including specific allegations of racketeering activities subject to enhanced sentencing under 18 U.S.C. §1963(a) was filed on June 13, 2023. (Doc. 220.)

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and F.R.A.P. 4(b) in that it is a direct appeal from a final judgment of the United States District Court for the Middle District of Georgia, Athens Division, wherein a life sentence of imprisonment was imposed on Appellant's guilty verdict on one count of RICO Conspiracy under 18 U.S.C. §1962(d) including racketeering acts for a which a life sentence was the maximum sentence under 18 U.S.C. §1963(a). (Doc. 423.) The judgment in Lesley C. Green's case was filed on February 22, 2024 (Doc. 423) and, through Appellate Counsel, Lesley C. Green filed his Notice of Appeal in a timely manner on March 4, 2024, resulting in this Appeal (Doc. 427).

## <u>STATEMENT OF THE ISSUES</u>

I.    Was sufficient evidence introduced to establish all the elements of a RICO Conspiracy under 18 U.S.C. §1962(c) and (d)?

II.   Did the district court abuse its discretion by admitting wiretap evidence at trial?

III.  Did the district court abuse its discretion by determining a jailhouse letter to be non-hearsay as a co-conspirator's statement and admitting the letter at trial?

IV.   Did the district court abuse its discretion by admitting evidence at trial over objections as to relevance under Federal Rule of Evidence 401 and undue prejudice under Federal Rule of Evidence 403?

## **STATEMENT OF THE CASE**

### i. COURSE OF PROCEEDINGS

Lesley C. Green, Appellant herein, brings this appeal from his conviction in the United States Middle District Court of Georgia on one count of RICO Conspiracy under 18 U.S.C. §1962(d) that included specific allegations of racketeering acts subject to enhanced sentencing under 18 U.S.C. §1963(a).

An original indictment charging Appellant Lesley C. Green and others[1] as stated above was returned by the United States Middle District of Georgia Grand Jury on June 15, 2022. (Doc. 1.) A superseding indictment charging Appellant Green and others[2] [3] as stated above was returned by the United States Middle District of Georgia Grand Jury on June 13, 2023. (Doc. 220.)

On June 14, 2023 a suppression hearing was held wherein Appellant Green contested the admission of certain evidence, including wiretap evidence, that the

---

[1] Appellant Green was charged with Philmon Chambers, Andrea Browner, Shabazz Guidry, and Robert Carlisle in the original Indictment.

[2] Appellant Green was charged with Philmon Chambers and Andrea Browner only in the superseding Indictment.

[3] Additional counts in both the original and superseding Indictments charged Chambers and Browner with more crimes related to the RICO Conspiracy, but Appellant Green was only charged in Count 1, so that count will be the primary focus of this Appeal.

district court subsequently permitted to be introduced at his trial.  (Doc. 244; Doc. 465.)  Appellant Green ultimately exercised his right to trial on the June 2023 superseding indictment from July 31, 2023 to August 17, 2023 before the Honorable Judge Marc T. Treadwell and a jury.  (Doc. 357; Doc. 336.)  Philmon Chambers and Andrea Browner were tried as co-defendants with Appellant Green.

On August 17, 2023, Appellant Green was convicted of the RICO Conspiracy Count and the specific racketeering acts subject to enhanced sentencing.  (Doc. 343).  He appeared before Judge Treadwell for sentencing on February 20, 2024 at which time he was sentenced to confinement for life.  (Doc. 423.)  **Appellant Lesley C. Green is currently incarcerated on the sentence.**

The Judgment on Appellant Green's sentence was filed February 22, 2024 (Doc.423) from which he filed the Notice of Appeal that leads to this Appeal of his final judgment  (Doc. 427).

## ii. STATEMENT OF FACTS

The following facts are relevant to the issues here on appeal:

Prior to trial, Shabazz Guidry and Robert Carlisle each pled guilty on the original June 2022 indictment to a single count of RICO Conspiracy including specific racketeering acts subject to enhanced sentencing. (Doc. 162; Doc. 209.) Appellant Green, Philmon Chambers, and Andrea Browner exercised their rights to trial, were subsequently re-indicted on the same charges on June 13, 2023 (Doc. 220), and were co-defendants in the joint jury trial held July 31, 2023 to August 17, 2023 (Doc. 357; Doc. 370).

After the close of evidence, the jury determined co-defendant Chambers killed Rodriguez Rucker on December 14th, 2018 in Athens-Clarke County, Georgia. (Doc. 358- Pg. 187; Doc. 359- Pg. 117-18; Doc. 370 - Pg. 23-24.) Rucker was the cousin of Maurice Lawrence, a person culpable in killing Walter Brown (an Athens-area Gangster Disciples) in Athens earlier in December 2018. (Doc. 358 – Pg. 149-50; Doc. 359 – Pg. 25-28; Doc. 361 – Pg.160, 167, 174.)

The Gangster Disciples are a gang started in Chicago in the late 1960's by Larry Hoover and others. (Doc. 362- Pg. 181.) Much like the geographical makeup of the United States, the Gangster Disciples have a presence across the country with national, regional, state, and local divisions. (Doc. 362- Pg. 187, 189-90.) Female

compatriots of the Gangster Disciples are referred to as Sisters of the Struggle. (Doc. 362- Pg. 205.) Local Gangster Disciples divisions have their own autonomy and act to their own needs so long as they fulfill their obligations to the State and National leaders.   (Doc. 360- Pg. 38; Doc. 362- Pg. 240, 244.)

Chambers was identified as someone in a position of authority within the G-side division of the Gangster Disciple.   (Doc. 362- Pg. 39.)   The G-side division conducted activities in Gwinnett County, Georgia and parts of DeKalb and Rockdale Counties, Georgia. (Doc. 362- Pg. 238.) Athens Gangster Disciples are not part of the G-side division (they are their own division within a different Gangster Disciples region of Georgia)  (Doc. 362- Pg. 240), but a girlfriend of Chambers, co-defendant Browner resided in Athens in 2018 (Doc. 361- Pg. 167; Doc. 365- Pg. 64).   Browner identified as a Sister of the Struggle and was associated with Walter Brown as an Athens division Gangster Disciples.   (Doc. 361- Pg. 161, 167-68.)

On December 14, 2018, Browner, while prostituting in Athens, encountered Rodriguez Rucker and became aware of his relationship to Maurice Lawrence. (Doc. 341- Exh. 325, Pg. 99; Doc. 358- Pg. 241; Doc. 359- Pg. 1.)   Browner immediately contacted Chambers and the two constructed the plan to retaliate

against Rucker for Brown's death.  *Id*.  No one other than Chambers and Browner were involved in RR's death.[4]  *Id*.

An Athens Gangster Disciples, Joshua Jackson, had been in the area of Browner's prostitution meet-up with Rucker, but was not involved in Chambers and Browner's plan.  (*Id*; Doc. 341- Exh. 18.)  Of significance to this appeal, no evidence was produced showing Appellant Green or anyone else involved with the G-side division, other than Chambers, knew anything about Chambers and Browner's activities in Athens and/or the plan to kill anyone in Athens.

Following the Rucker killing, Chambers and Browner fled to Texas.  On December 15, 2018, Browner was arrested in Texas[5] and her vehicle was seized and searched.  (Doc. 358- Pg. 236; Doc. 359- Pg. 17.)  Among things seized was a binder containing Gangster Disciples materials.  (Doc. 359- Pg. 42-44.)  One of the items is a writing  (Doc. 341- Exh. 73, Pg. 2) which appears to be some sort of list.  Over objection, the writing was introduced at trial as evidence of Appellant Green's participation on the G-side "E-Team" or "Enforcement Team," a loosely described

---

[4] Browner was also convicted in the joint trial as a co-conspirator to Chambers in Rucker's death.

[5] Chambers was not apprehended with Browner on this date, but was later arrested in Texas.  (Doc. 360- Pg. 87-88; Doc. 363- Pg. 122.)

G-side subgroup charged with enforcing G-side rules.  (Doc. 369- Pg. 122; Doc. 360- Pg. 150; Doc. 361- Pg. 102.)

Chambers remained in Texas from the time of fleeing Georgia to his ultimate arrest on March 6, 2019.  (Doc. 363- Pg. 122.)  While he was in Texas, the Government obtained a wiretap order to intercept communications on a cellular telephone used by Chambers.[6]  (Doc. 188- Exh. 2.)  Over Appellant Green's Motions to Suppress and additional trial objection (Doc. 171; Doc. 188; Doc. 358- Pg. 245-246; Doc. 359- Pg. 212), the trial court ruled communications intercepted under the order to be admissible at trial   (Doc. 224; Doc. 359- Pg. 212), and the Government subsequently introduced approximately 53 intercepted calls, including calls related to Appellant Green (Doc. 341- Exh. 160, 161-214).

In one intercepted call, Chambers voiced his suspicion that Jackson provided information to law enforcement.  (Doc. 341- Exh. 181.)  In the days leading up to December 18, 2018, both Browner and Chambers communicated with Jackson and another Athens Gangster Disciple Derrick Ruff.  (Doc. 341- Exh. 325, Pg. 122-124, 135-136.)  On December 18. 2018, Chambers spoke with Ruff and then Ruff (or someone using his cell phone) began communicating with a cell phone

---

[6] The Government sought and obtained multiple wiretap orders to intercept telecommunications during the investigation of the matters at issue, but only introduced calls from one telephone possessed by Chambers.

connected to Appellant Green about meeting up with Appellant Green, Shabazz Guidry, and Robert Carlisle in Gwinnett County.  (Doc. 341- Exh. 325, Pg. 137-38.)

Shabazz Guidry testified under a plea agreement (Doc. 341- Exh. 195) at trial and acknowledged holding a position of authority within the G-side division of Gangster Disciples in 2018 (Doc 361- Pg. 39).  Carlisle also testified under a plea agreement (Doc. 341- Exh. 196) at trial and admitted knowing Chambers unrelated to any gang activities as a personal friend since they were teenagers (Doc. 364- Pg. 140).  Carlisle acknowledged awareness of the G-side Gangster Disciples, but both he and Guidry denied he was ever a member.  (Doc. 361- Pg. 56; Doc. 364- Pg. 140; Doc. 365- Pg. 37, 40.)  Appellant Green was identified as a G-side member known by the moniker "Grip."  (Doc. 360- Pg. 153, 157.)

Based on testimony from Guidry and Carlisle, Ruff and Jackson drove from Athens to a Wal-Mart parking lot located in Gwinnett County and met Appellant Green, Guidry, and Carlisle.  (Doc. 360- Pg. 165; Doc. 364- Pg. 149-151.)  Neither Guidry nor Carlisle carried in-service phones to the meeting.  (Doc. 361- Pg. 60; Doc. 364- Pg. 188.)

Appellant Green, Guidry, and Carlisle arrived at the meet in a Jeep Grand Cherokee registered to Appellant Green.  (Doc. 360- Pg. 163; Doc. 364- Pg. 150.)

Wal-Mart surveillance photos show the Jeep and the vehicle occupied by Ruff and Jackson near one another in the parking lot. (Doc. 341- Exh. 107-111.) The photos and cell phone evidence are the only non-testimonial evidence from December 18, 2018 connecting Appellant Green to Ruff and Jackson. The remaining trial evidence regarding the sequence of events on December 18, 2018 comes from the testimony and statements of Guidry and Carlisle.

According to Guidry and Carlisle, Guidry drove the Jeep and Appellant Green and Carlisle were passengers. (Doc. 360- Pg. 165; Doc. 364- Pg. 150.) Ruff and Jackson came in Ruff's vehicle. (Doc. 360- Pg. 165; Doc. 364- Pg. 151.) After the two sides met up, they stayed in the parking lot for a short time smoking marijuana. (Doc. 360- Pg. 160, 165-66; Doc. 364- Pg. 153.) From there, they traveled in their respective vehicles to another location where the Ruff vehicle was parked and everyone entered the Jeep with Guidry continuing to drive. (Doc. 360- Pg. 168; Doc. 364- Pg. 154.)

Guidry then drove the group to a Storage Unit facility in Gwinnett County with Ruff and Jackson being told they were there to steal stuff. (Doc. 360- Pg. 170; Doc. 364- Pg. 155.) After arriving, the group broke into a storage unit using a technique known by Carlisle that would not easily reflect the break-in. (Doc. 364- Pg. 158; Doc. 365- Pg. 45, 54.)

All five (5) men entered the storage unit.  (Doc. 360- Pg. 179; Doc. 364- Pg. 159.)  Once in the unit, Carlisle testified a tussle of some form ensued.  (Doc. 364- Pg. 160.)  Guidry and Carlisle testified Jackson was armed with a firearm, but also claim Appellant Green shot and killed both Ruff and Jackson inside the storage unit.  (Doc. 360- Pg. 180; Doc. 361- Pg. 66-67; Doc. 364- Pg. 160-61; Doc. 365- Pg. 20, 27-28.)  According to Carlisle and Guidry, the three (3) survivors then left the unit, secured it back, and left the deceaseds there.  (Doc. 360- Pg. 187; Doc. 364- Pg. 161-62.)

[Appellant Green presents the above-described testimony of Guidry and Carlisle as most favorable to the Government's case regarding the events of December 18, 2018, but points out the following credibility issues that weigh against their testimonies:  (1) both Guidry and Carlisle admitted they were testifying with the intent to help themselves in their own cases (Doc. 361- Pg. 17, 22-23; Doc. 365- Pg. 28-29), (2) both testified that the trial was the first time they asserted Appellant Green had a gun and shot Jackson and Ruff (Doc. 361- Pg. 17; Doc. 365- Pg. 28-29), (3) both admitted to telling conflicting stories regarding the events of December 18th (Doc. 361- Pg. 63, 84; Doc. 365- Pg. 55-56, 58, 60), and (4) both described having issues with Appellant Green --- Guidry, when talking with Chambers about Appellant Green on a wiretap call, suggested he knew how to "seal up a leak" in reference to Appellant Green (Doc. 361- Pg. 53, 86) and

Carlisle claimed he confronted Appellant Green in July 2022 (described in detail later) because Appellant Green was supposed to absolve him of involvement in the events of December 18th (Doc. 365- Pg. 28-29).  The credibility issues of Guidry and Carlisle are pointed out as weighing against a finding of harmless error upon any determination by this Honorable Court that the other evidence challenged by Appellant Green in this Appeal was improperly admitted at trial, as the testimonies required bolstering from the contested evidence.]

Chambers became aware of Ruff and Jackson's deaths and began to communicate with various associates in Georgia in an effort to coordinate disposal of the bodies before they could be discovered by law enforcement.  (Doc. 341- Exh. 160-214.)  Into late February and early March 2019, Guidry and Carlisle were engaged in these communications with Chambers.  (Doc. 341- Exh. 212-214.)   Before Chambers could coordinate actual movement of Ruff and Jackson, Chambers was arrested in Texas (Doc. 363- Pg. 167), and Ruff and Jackson's remains were located on March 17, 2019 (Doc. 363- Pg.112-13).

On March 18, 2019, Appellant Green was arrested at his home on State charges related to the deaths of Ruff and Jackson.  (Doc. 365- Pg. 82.)   In conjunction with the arrest, Appellant Green's home was searched and numerous items were seized, including bulletproof vests and plates that were ultimately introduced at trial, over

objection, as evidence suggesting him to be violent and a member of the G-side E-Team.  (Doc. 365- Pg. 84-85; Doc. 341- Exh. 217, 218, 225, 226.)

Appellant Green has remained in custody since his arrest.  Following his arrest, Appellant Green met with law enforcement agents several time between April 2019 and July 2022 to proffer information to law enforcement and pursue plea options related to the Ruff and Jackson deaths.  (Doc. 366- Pg. 9, Doc. 367- Pg. 201, 205-206, 207, 217.)  After Appellant Green met with law enforcement and while Chambers was incarcerated in Gwinnett County, Georgia, Chambers wrote a September 2020 letter intercepted by detention personnel that contains information about the deaths of Ruff and Jackson and specifically speaks to Appellant Green's involvement.  (Doc. 341- Exh. 239; Doc. 364- Pg. 43-44.)  In particular, the letter, in separate sections, reads:

> If they would've stuck 2 da script in case things went bad, then Grip, Different, and Larry would be home…Better yet if CLEAR instructions would've been followed by Grip, then it wouldn't even be a case!  They neva would've placed him at da scene meeting dem niggaz.  But he was cheap about the gas money and da drive he was being lazy about it… he didn't tell dem da instructions <u>he</u> was given. (Doc. 341- Exh. 239, Pg.2)…
>
> I had my book of knowledge, my Moorish national documents, a notebook that had a list of the G-Side E-Team in 2016 (Doc. 341- Exh. 239, Pg.6).

Over objection, these sections of the letter were introduced by the Government at trial as part of its evidence against Appellant Green. (Doc. 367- Pg. 248-49, 259.) Whereas Guidry and Carlisle were subjected to cross-examination that brought out numerous credibility issues, the letter was presented without confrontation, as Chambers did not testify during trial.

In July 2022, Chambers, Carlisle, Guidry, and Appellant Green were transferred by federal law enforcement officials from state to federal custody following return of the initial indictment in this case and were temporarily housed together in a federal holding facility in Lovejoy, Georgia. (Doc. 361- Pg. 35.) Having already been threatened while in state custody (Doc. 361- Pg. 32-33; Doc.339- Exh.6.), both Guidry and Appellant Green were threatened at this time by Chambers and Carlisle into signing renouncements of their post-arrest interactions with law enforcement (Doc. 361- Pg. 35). Guidry testified at trial to the circumstances and no evidence exists to suggest the coerced denunciations resulted from anything but Chambers' intimidation. *Id*.

Appellant Green ultimately chose to exercise his right to trial; and, following the 14-day long trial, Appellant Green was convicted on the Superseding Indictment's Count One- RICO Conspiracy and determined to be subject to enhanced sentencing as culpable for the deaths of Ruff and Jackson under Paragraphs 29 and

30 of the Indictment.  (Doc. 370 – Pg. 24.)  On February 20, 2024, Judge Marc T. Treadwell sentenced Lesley Green to two (2) concurrent life sentences.  (Doc. 423.)

In view of the above-cited facts, Appellant Green now appeals from the district court's judgment and sentence.


## iii. STANDARDS OF REVIEW

Two standards of review apply to the issues raised in this Appeal.


As to Appellant Green's argument in Section I *infra*, a challenge to the sufficiency of the evidence is reviewed de novo with the Court "looking at the evidence in the light most favorable to the government and resolving all reasonable inferences in favor of the verdict."  *United States v. Colston*, 4 F.4th 1179, 1189 (11th Cir. 2021) (citation omitted).  When no reasonable construction of the evidence supports the jury's guilty verdict beyond a reasonable doubt, a conviction must be overturned. *See United States v. Verdeza*, 69 F.4th 780, 788 (11th Cir. 2023).   The same standard applies to review of the district court's ruling on Appellant Green's Fed. R. Crim. P. 29 motion for judgment of acquittal.  *See United States v. Moore*, 76 F.4th 1355, 1363 (11th Cir. 2023).

As to Appellant Green's arguments in Sections II through IV *infra*, preserved evidentiary rulings are reviewed for abuses of discretion.  *Id*. citing *United States v. Hill,* 643 F.3d 807, 840 (11th Cir. 2011).  "An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *United States v. Smith*, 459 F.3d 1276, 1295 (11th Cir. 2006) (quoting *United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005)).  When reviewing evidentiary matters first raised in a Motion to Suppress, the Court is "not restricted to the evidence presented at a suppression hearing and instead will consider the whole record." *U.S. v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).

# SUMMARY OF THE ARGUMENTS

In Section I *infra*, Appellant Green shows this Honorable Court that the Government's evidence does not support a finding that the two (2) racketeering acts alleged by the Government to subject him to an enhanced sentence of life imprisonment were done in furtherance of the alleged RICO enterprise as required to meet the 5th element of a 18 U.S.C. 1962(c) and (d) RICO violation regarding a pattern of racketeering activity, as the acts were personal to a co-defendant rather than in furtherance of the RICO enterprise.

In Section II *infra*, Appellant Green shows this Honorable Court that the district court abused its discretion in allowing the introduction of wiretap evidence, under federal wiretap terms, conditions, and procedures now applicable to a state of Georgia wiretaps, that was intercepted outside the territorial jurisdiction of the court order permitting interception of communications in the case in that the intercepted device was not within the jurisdiction at the time of interceptions and the Government presented evidence establishing the interceptions first occurred through a device also not shown to be within the jurisdiction.

In Section III *infra*, Appellant Green shows this Honorable Court that the district court abused its discretion in allowing the introduction of a co-defendant's jailhouse letter, containing inculpatory evidence as to him, as a non-hearsay co-conspirator's statement made during the course of the conspiracy, as Appellant Green had withdrawn from the conspiracy at the time of the letter by meeting with and providing information to law enforcement officials against the conspiracy and of which the co-defendant was aware such that the letter should have not been admitted when Appellant Green had no opportunity to confront its writer under the Sixth Amendment.

In Section IV *infra*, Appellant Green shows this Honorable Court that the district court abused its discretion in allowing the introduction of (1) a writing found among a co-defendant's belongings and (2) ballistic vests/plates seized from Appellant Green's home under Federal Rules of Evidence 401 and 403 as evidence of his involvement with a subgroup of the G-side Gangster Disciples suggested to be violent when no circumstances explaining the timing, notations, and purpose of the writing were offered and the vests/plates were also introduced without any explanation of their connection to the subgroup, meaning the evidence was either not relevant to issues before the jury or, if scantly relevant, was so unfairly prejudicial and/or misleading that it tainted the jury's focus and Appellant Green's right to a fair trial.

## ARGUMENT AND CITATIONS OF AUTHORITY

**I.     The Government failed to prove all the elements of a Racketeering (RICO) offense under 18 U.S.C. §1962(c) in relation to the deaths of Derrick Ruff, Jr. and Joshua Jackson; therefore, Appellant's conviction under Count One of the Indictment (RICO Conspiracy) must be overturned.**

The Government failed to prove all the elements necessary to convict Appellant Lesley Green of a RICO violation as it relates to the enhanced sentencing allegations in its Indictment concerning the deaths of Derrick Ruff, Jr. and Joshua Jackson.  Specifically, the Indictment alleges in Paragraphs 29 and 30, and the Government was required to prove, that **as part of a RICO enterprise**, Appellant Green, while aiding and abetting others, did intentionally, unlawfully, and with malice aforethought, kill Derrick Ruff, Jr. and Joshua Jackson in violation of Georgia law.  (Doc. 220- Pg. 20.)

In short, Federal RICO law prohibits a person who is affiliated with a broadly defined "enterprise" from conspiring to **conduct that enterprise's affairs through a "pattern of racketeering activity**." 18 U.S.C. §§ 1962(c) and (d).[7]  To establish

_____

[7] Appellant Green acknowledges he is actually charged under 18 U.S.C.A. §1962(d) of engaging in a RICO Conspiracy, but submits his issue on appeal is not

a violation of 18 U.S.C. Sec. 1962(c), the government must prove: (1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity. *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir. 1995).

Herein, Appellant Green challenges only the sufficiency of evidence as to the fifth element. Nevertheless, the Government's evidence on the first four does illuminate Appellant Green's contentions on the fifth. To that end, Appellant's Counsel accepts the existence of the following evidence as to Appellant Green on the first four elements: (1) the G-side division of the Gangster Disciples was a specific enterprise that operated in the Gwinnett, DeKalb, and Rockdale County areas of Georgia[8], (2) the G-side's operation, at a minimum, involved narcotics dealing and theft that affected interstate commerce, (3) Appellant Green was

_____

impacted by that distinction as the Government has to meet the same burden raised herein on the contested RICO violations whether charged substantively or as a conspiracy.

[8] Appellant Green expects the Government to suggest that it presented the Gangster Disciples in general as the RICO enterprise, but he contests there was any evidence showing him to have any relationship with any Gangster Disciple group other than the G-side.

associated with the G-side enterprise, and (4) Appellant Green participated, either directly or indirectly, in the affairs of the G-side enterprise.

However, the Government failed to establish the fifth RICO element in relation to the deaths of Ruff and Jackson, in that it failed to establish their deaths were related to the G-side enterprise.

"[W]hat is required to satisfy the last [fifth] element of a RICO substantive offense[,] that the defendant participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity[,] is **a relation between the predicate offenses and the affairs of the enterprise**." *United States v. Welch*, 656 F.2d 1039, 1061 (5th Cir. Sept. 1981)[9] citing *United States v. Martino*, 648 F.2d 367, 403 (5th Cir. 1981) (emphasis added). "The gist of the RICO offense… is that the defendant, through a pattern of predicate crimes, furthered a racketeering enterprise. The offense … is not the commission of the predicate crimes, but the furthering of the enterprise." *Welch*, 656 F.2d at 1053 citing *United States v. Elliott*, 571 F.2d 880 (5th Cir.), cert. denied, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *see also Starrett*, 55 F.3d 1525 (11th Cir. 1995). Simply

---

[9] Decisions of the former Fifth Circuit rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

stated, the predicate acts must be committed in conducting the affairs of the enterprise.

Here, the Government's evidence failed to establish the deaths of Ruff and Jackson, and Appellant Green's alleged involvement in them, furthered the G-side enterprise. To the contrary, the deaths served to further Chambers' personal agenda. While G-side members, including Appellant, conceivably played a role in the deaths, it was not as part of or on behalf of G-side operations.

The G-side division had no dealings or role in Athens, Georgia. In fact, Chambers engaged himself in events in Athens outside his activities with the G-side division. No evidence exists that Chambers on behalf of the G-side or the G-side itself was requested to act or participate in affairs or activities in Athens. (Doc. 362- Pg. 238, 240.) The evidence suggests Chambers acted based on his individual relationships. (Doc. 361- Pg. 161, 167-68.)

Yes, Walter Brown, an Athens Gangster Disciple, was killed in Athens. (Doc. 361- Pg. 160-167, 174.) Yes, Andrea Browner, a girlfriend of Chambers, lived in Athens and was associated with the Gangster Disciples, generally as a Sister of Struggle. (Doc. 361- Pg. 161, 167-68.) Yes, Chambers and Browner were in a relationship. Yes, Gangster Disciples within their local circles are known to seek their own justice for acts against their circle. (Doc. 362- Pg. 237.) However, no

evidence exists to suggest Chambers' specific decisions and actions regarding Rucker, Ruff, and Jackson had anything to do with the G-side division he was responsible to and for.

Chambers' connection to the Gangster Disciples was as a G-side person of authority.  (Doc. 362- Pg. 39.)   Brown was not a member of the G-side. Chambers' killing of Rucker was not to achieve justice for the G-side or to further its affairs.  Neither were Ruff and Jackson G-sides.  The only common link between Ruff, Jackson, Guidry, Carlisle, and Appellant Green was Chambers, and the link was not in relation to G-side business or the furtherance of G-side affairs, but in furtherance of Chambers' personal motivations.

Appellant Green likens the behavior to a Gambino mobster passionately killing someone flirting with his wife and then orchestrating, with "made" and "unmade" Gambino associates he knows, the deaths of two others who may have known what he did.  The deaths may be grotesque, illegal under other laws, and involve other mobsters, but that does not make them RICO violations when they do not further the affairs of the Gambino enterprise, which is the signature requirement of a RICO violation.

Given the lacking evidence on the fifth element of a RICO violation relating to Ruff and Jackson's deaths being acts in furtherance of the G-side Gangster

Disciples RICO enterprise, the trial court erred in not granting Appellant Green's Rule 29 Motion for Directed Verdict (Doc. 368- Pg. 266-67) and the Jury was not authorized to find Appellant Green guilty for enhanced sentencing purposes. Accordingly, Appellant Green's convictions on Paragraphs 29 and 30 of the superseding indictment subjecting him to enhanced RICO sentencing must be reversed.

**II.    The Government unlawfully introduced wiretap evidence that had a harmful effect to Appellant Green; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) must be overturned.**

Over Appellant Green's Motions to Suppress (Doc. 171, 188) and additional trial objection (Doc. 358- Pg. 138-39, 245-246; Doc. 359- Pg. 212), the Government presented illegally obtained wiretap evidence under O.C.G.A. §16-11-64, 18 U.S.C. Chapter 119, and the 4th Amendment in its case against Appellant Green. (Doc. 341- Exh. 161-214.)

On February 12, 2019, a Georgia Superior Court Judge issued an Order permitting the interception of communications on a telephone linked to and alleged to be

possessed by Chambers based on an application from a Georgia prosecutor and a Georgia law enforcement affidavit.  (Doc. 188- Exh. 2.)

Chambers was a known fugitive from Georgia and located outside the State at the time the Order was granted.  The Order specifically limited the use of pen registers and/or trap and trace devices to the State of Georgia as well as interception of communications to within the State of Georgia.  (*Id*. at 10-11.)  The Order also mandated that anyone acting to monitor the calls comply with all terms of the Order.  (*Id*. at 11-12.)

On the question of the validity of wiretap orders, this Honorable Court has held that its district courts must defer to state law on orders "obtained by state law enforcement officers in state courts."  *United States v. Glinton*, 154 F.3d 1245, 1253 (11th Cir. 1998) citing *United States v. Bascaro*, 742 F.2d 1335, 1347 (11th Cir. 1984).  Such is the case here; however, **and significantly**, Georgia law actually defers to Federal standards to determine the authorization for wiretaps, meaning the wiretap activities in this case must ultimately be reviewed under Federal wiretap guidelines.

Pointedly, Georgia's statute outlines two (2) primary requirements for Georgia wiretaps to be lawful and evidence obtained therefrom to be admissible.  *See* O.C.G.A. §16-11-64(c) (Georgia's wiretap statute).  One, wiretap evidence must

meet the procedures and conditions established under Federal law, that being 18 U.S.C. Chapter 119. Two, the statute restricts interception of communications to those occurring within the State of Georgia.

The pertinent part of the statute reads:

> [A] court may issue an investigation warrant permitting the use of a device for the surveillance of a person or place to the extent the same is **consistent with and subject to the terms, conditions, and procedures provided for by 18 U.S.C. Chapter 119 [that being Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 – 2522]**. Such warrant shall have state-wide application and interception of communications shall be permitted in any location in this state.

O.C.G.A. §16-11-64(c) (emphasis added).

When the first Georgia requirement (that its wiretap orders satisfy federal rules) is applied, Federal law mandates a wiretap order may only authorize or approve **interception** of communications within the territorial jurisdiction of the court in which the judge sits, in this case the State of Georgia. 18 U.S.C. § 2518(3).

While the actual Order itself in this case limits the interceptions to the State of Georgia[10] (Doc. 188- Exh. 2, Pg. 10-11), the Government's evidence fails to show it actually complied with the limitation in that the intercepted Chambers' phone was NOT within Georgia at the time of interception and the evidence otherwise fails to show the intercepts occurred within the territorial boundaries of Georgia.

At trial, FBI Supervisory Special Agent (SSA) Jamaal King testified as a supervising agent over the FBI's Telecommunications Intercept and Collection Technology Unit (TICTU) regarding the evolution of interceptions and the intercepts of the telecommunications in this case. (Doc. 358- Pg. 126.)[11]   He testified an interception is setup within the cellular service provider's network and "[t]he interception of a call actually occurs in the telephone company's switch…The audio for 4G, 5G, VOLTE calls is first sent to my unit in Quantico, Virginia, where we in turn pass it along to the collection system." (Doc. 358- Pg. 134, 141.)   He further testified the described process was applied in this case and that the Chambers' calls were intercepted to Quantico, Virginia and then routed from Quantico to the field office collection location where they were listened to, in this case being Athens, Georgia.

---

[10] Appellant Green does not contest the State of Georgia being within the territorial jurisdiction of the issuing judge.

[11]   SSA King also testified concerning Government Trial Exhibit 313 (a demonstrative diagram depicting the interception occurring at the network switch), but the Government did not file the Exhibit in the record, so Appellant Green is including it at the end of his Appendix.

(Doc. 358- Pg. 135.)   SSA King was unable to identify where the switches are located that sent the intercepted 4G and 5G VOLTE calls to Quantico.  (Doc. 358- Pg. 134, 140-141.)

Appellant Green does not contest that the intercepted calls were listened to Georgia, but submits the process presented by SSA King establishes that the service provider's switch is the location of the 4G and 5G VOLTE intercepts, and the Government cannot establish it occurred within the territorial limit of the Order, that being Georgia.

Appellate Counsel anticipates the Government will point to *United States v. Stowers*, 32 F.4th 1054 (11th Cir. 2022) to support a contrary position.  And, while the *Stowers* case does find that Georgia courts have held that "as long as the listening post is within the state of Georgia, it does not matter where the call is made" (*Stowers*, 32 F.4th at 1070 citing *Luangkhot v. State*, 292 Ga. 423, 736 S.E.2d 397, 426 (GA 2013)), Appellant Green counters it is not directly on point with the issues raised herein as *Stowers* (1) does not address the contention that Georgia has actually deferred to federal interpretation of where "interception" occurs or what Federal authority on the matter is[12], (2) does not specifically address 4G and 5G

---

[12] Stated differently on this issue, Georgia's interpretation of Federal law cannot be read to trump Federal law when its statute actually defers to Federal law as authoritative.

intercepts, and (3) certainly does not address the precise interception process at the network switch described by Agent King for 4G and 5G intercepts.

Admittedly, the precise issues Appellant Green raises are seemingly matters of first impression but their consideration still, nevertheless, supports suppression of the wiretap evidence. Furthermore, Appellant Green respectfully reminds this Honorable Court that where ambiguity and doubt exists as to a statute's application, it is be resolved in favor of a criminal defendant as Appellant Green is here. *United States v. Jenkins*, 58 F.3d 611, 613 (11th Cir. 1995); *United States v. McLemore*, 28 F.3d 1160, 1165 (11th Cir. 1994).

Under the Georgia wiretap statute (O.C.G.A. §16-11-64(c)), federal law must be applied when deciding the validity of this wiretap Order and not Georgia court decisions that fail to cede to Federal standards. By inserting the language "to the extent the same is consistent with and subject to the terms, conditions, and procedures of the Federal statutes" in its statute, the Georgia legislature specifically makes and requires Federal law and rulings to be authoritative on matters of interpretation, not Georgia interpretations that predate the statutory amendment or the technology addressed in this case. *Id*. No other interpretation seems plausible or logical.

In fact, the Georgia Supreme Court said as much in *Luangkhot*, 736 S.E.2d at 399, by acknowledging (1) the Georgia statute defers to the federal statute and (2) the federal statute and case law must be looked to for guidance regarding wiretap issues (in that particular case, a jurisdictional question). As such, the *Stowers* ruling should not bind this Honorable Court in this case, and this Court should make an independent determination as to whether the intercepted calls meet federal standards for interception within territorial boundaries. Appellant Green submits they do not.

To that end, 18 U.S.C. §2515 mandates the exclusion of evidence the seizure of which was in violation of the Electronic Communication Privacy Act. *Fleming v. United States*, 547 F.2d 872, 874 (5th Cir. 1977). The U.S. Supreme Court has plainly stated that "Congress intended to require suppression where there is [a] failure to satisfy **any** of [the] statutory requirements that directly and substantially implement the **congressional intention to limit the use of intercept procedures** to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527 (1974) (Emphasis Added).

In this case, that requires a determination of what the location of the "interception of communication" is and whether it satisfied territorial jurisdiction under federal law. In *United States v. Nelson*, 837 F.2d 1519, 1527 (11th Cir. 1988), this Court held "the term 'intercept' as it relates to 'aural acquisitions' refers to the place where a

communication is initially obtained regardless of where the communication is ultimately heard." Also, in another case considering the common meaning of intercept outside the context of Title III, this Court found the intercepting device was the dispatch console from which a recording was initiated. *Epps v. St. Mary's Hosp. of Athens, Inc.*, 802 F.2d 412, 415 (11th Cir. 1986).

While the *Nelson* holding is 11th Circuit precedent valuable to his position, Appellant Green's Counsel acknowledges it does not address the exact fact pattern here regarding the interception of a telephone located outside the territorial jurisdiction and has been unable to identify any 11th Circuit or U.S. Supreme Court case that makes a specific holding regarding "out of jurisdiction" telephones or 4G and 5G VOLTE communications and network switch intercepts. However, this also means that the Government's assertion at the trial level that its position is supported by binding precedent is incorrect given that every case it relies upon deals with application of state-level interpretations which are no longer binding as to Georgia wiretaps unless in line and consistent with federal law and federal interpretations.

Furthermore, while also conceding that the Government is likely to point to other circuits having determined up to now that the interception of communications may meet territorial restrictions if either the intercepted device or the "listening post (the place where law enforcement first hears the communication)" are located within the

jurisdiction of the court issuing the order, Appellant Green does not and cannot concede that (1) the Supreme Court would agree, or (2) this Court has agreed when interpreting Title III itself rather than merely applying a state interpretation of state wiretap laws, or (3) this Court must agree in relation to 4G and 5G VOLTE communications, as ALL such opinions expected to be cited from the Government have been in relation to non-4G/5G intercepts and do not speak to the interception process described by its authority on the subject, SSA King, in this case.[13]

To the point concerning the Supreme Court, in *United States v. Dahda*, 138 S.Ct. 1491, 1495, 200 L.Ed.2d 842 (2018), Justice Brewer, in delivering the Supreme Court's opinion, specifically noted that the Court was accepting an **uncontested assertion** made by the Government that an intercept occurs either where the tapped

---

[13] *See United States v. Rodriguez*, 968 F.2d 130, 135-136 (2d Cir. 1992) (holding that "a communication is intercepted not only where the tapped telephone is located, but also where the communications are first to be heard"); *United States v. Jackson*, 849 F.3d 540, 551-53 (3d Cir. 2017) (finding that "the listening post" theory applied to a Pennsylvania state court order when the wiretap was first heard in the state even though the phone was not located in the state); *United States v. Denman*, 100 F.3d 399, 403 (5th Cir. 1996) (holding that interception includes both the location of a tapped telephone and the original listening post); *United States v. Jackson*, 207 F.3d 910, 914 (7th Cir. 2000) (applying the listening post theory), vacated on other grounds, 531 U.S. 953 (2000); *United States v. Henley*, 766 F.3d 893, 911-12 (8th Cir. 2014) (applying the listening post theory to a Missouri federal judge's order permitting a phone located in Illinois to be listened to in Missouri); *United States v. Luong*, 471 F.3d 1107, 1109 (9th Cir. 2006) (holding, in pertinent part, that an interception occurs where law enforcement officers first overhear the call.)

telephone is located or the where the Government's listening post is located, but provided no further affirmation that such is a correct statement of law and cited no court decisions supporting the assertion. Appellant Green submits *Dahda* is not authority for the Government's position and, instead, actually intimates, given its lack of citation to any of the Circuit opinions for the position, the matter is not settled at the Supreme Court level in the way the Government asks this Court to believe.

Significantly, the Government's evidence in this case made it factually clear that communications at the 4G and 5G VOLTE level are actually intercepted at the moment they are split or diverted at the service provider switch (as described by SSA King) to both law enforcement facilities and the intended recipient. For purposes of this case, 18 U.S.C.§ 2510 (4) defines "intercept" as the aural or other[14] acquisition of the contents of any electronic communication through the use of any electronic, mechanical, or other device; 18 U.S.C.§ 2510 (5) states, in pertinent part, an "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral, or electronic communication; and 18 U.S.C.§ 2510 (12) defines "electronic communication" as any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in

---

[14] It is additionally significant to recognize that Congress added "or other" to the Statute in consideration of intercepts in a digital age occurring in methods other than auditory **after** other Circuits' interpretations of the meaning of "intercept."

part by a radio.  The Webster's Dictionary definition of acquisition is "the act of acquiring something."

Here, SSA King described the switch as being the device facilitating interception and the Government offered no evidence the intercepting switch was located in Georgia, the territorial jurisdiction.  Without such proof and with Chambers being located in Texas when using the intercepted telephone, the interceptions were not shown to have occurred within the territorial jurisdiction of Georgia courts under Federal law or in compliance with the issuing court's Orders limiting interception to the State of Georgia.  (Doc. 188, Exh. 2, p. 10-11.)

Accordingly, Appellant Green submits all communications intercepted from Chambers' telephone should have been suppressed, and the admission of the evidence must be found to be reversible error.[15]

Furthermore, the *Leon* good faith exception and the *Giordano* core concern's analysis will not act to salvage the wiretap evidence since the presumptively out-of-state intercepts violate the issuing court's Order itself.  *United States v. Leon,* 468 U.S. 897 (1984); *Giordano*, 416 U.S. 505.

---

[15] The Government contends every call it introduced was pertinent to its claim of a RICO Conspiracy, so none can be deemed to be insignificant to its case.

Title III provides three grounds for suppression of wiretap evidence: "(i) the communication was unlawfully intercepted; (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) the interception was not made in conformity with the order of authorization or approval." 18 U.S.C. §2518(10)(a).

The *Giordano* analysis only applies to the first ground for suppression, 18 U.S.C. §2518(10)(a)(i). *Dahda*, 138 S.Ct. at 1497. And, the *Leon* exception only applies when the Government "innocently" complies with a tainted warrant or order. *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002.) Neither saving provision applies here since the Government's out of jurisdiction intercepts are in violation of the actual limitations provided in the Wiretap Order at issue, meaning the wiretap evidence must be suppressed under 18 U.S.C. §2518(10)(a)(iii) and Appellant Green's convictions reversed.

**III.   The Government unlawfully introduced statements of Appellant Green's co-defendant Philmon Chambers in violation of the hearsay rules and Appellant Green's Sixth Amendment confrontation rights; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) must be overturned.**

The admission at trial of co-defendant Philmon Chambers' September 2020 jailhouse letter (Doc. 341- Exh. 239) violates Appellant Green's Sixth Amendment confrontation rights.  Chambers did not testify at trial, but inflammatory portions of the letter were admitted over Appellant Green's objections. (Doc. 235; Doc. 364- Pg. 56; Doc. 367-  Pg. 7-9, 199-200, 206-07, 210, 248-49, 259.)    For the contents to have been admissible, they must either (1) not be hearsay or (b) meet a hearsay exception and not be inadmissible "testimonial" hearsay.

Among the contents of the Chambers' jailhouse letter introduced at trial were the following prejudicial sections:

> If they would've stuck 2 da script in case things went bad, then Grip, Different, and Larry would be home…Better yet if CLEAR instructions would've been followed by Grip, then it wouldn't even be a case!  They neva would've placed him at da scene meeting dem niggaz.  But he was cheap about the gas money and da drive he was being lazy about it… he didn't tell dem da instructions <u>he</u> was given. (Doc. 341- Exh. 239, Pg.2; Doc. 367- Pg. 249)…

I had my book of knowledge, my Moorish national documents, a notebook that had a list of the G-Side E-Team in 2016 (Doc. 341-Exh. 239, Pg.6; Doc. 367- Pg. 259).

The above-referenced sections of the letter were inadmissible against Appellant Green since he was not a participant in any alleged conspiracy at the time Chambers wrote the letter.

In relation to Appellant Green, the Government acknowledged he was meeting with the Government as early as April 2019 and offering information on the Ruff and Jackson deaths.  (Doc. 366- Pg. 9, Doc. 367- Pg. 201, 205-206, 207, 210, 217.) The lead FBI agent further acknowledged that the only significant difference between testimony from Carlisle and Guidry and the statements given by Appellant Green was in relation to who shot Ruff and Jackson.  (Doc. 367- Pg. 210.)  The Chambers' letter itself also references Appellant Green talking to the law enforcement (expressing awareness of Appellant Green no longer being his co-conspirator) (Doc. 366- Pg. 9; Doc. 367- Pg. 206), and the Government acknowledges Appellant Green's interviews with law enforcement were included in discovery at the state level that Chambers had likely seen (Doc. 366- Pg. 9).

Nonetheless, the letter evidence described above was offered and admitted as a co-conspirator's statement.  But, for "co-conspirator" evidence to be ruled admissible

under Rule 801(d)(2)(E), the government must establish by a preponderance of the evidence: (1) a conspiracy existed; (2) the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) **the statement was made during the course and in furtherance of the conspiracy**. *E.g.*, *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001)(emphasis added).

While Appellant Green cannot cite a decision by this Court directly on point with the situation presented here, available case law supports the reasonable conclusion that, even presupposing Chambers and Appellant Green were at some point engaged in a general conspiracy related to the deaths of Ruff and Jackson, inculpatory statements of Chambers made to others as part of his efforts to cover up the deaths after Appellant Green's withdrawal from the said conspiracy are not admissible against Appellant Green. *Compare United States v. Beale*, 921 F.2d 1412, 1423 (11th Cir. 1991) which recognizes a statement during the course of advancing separate conspiracies are not admissible against a co-conspirator not involved in the actual conspiracy being advanced.

Appellant Green's circumstances show he had effectively withdrawn from any conspiracy with Chambers (was no longer participating in any conspiracy with Chambers) when Chambers penned the letter. "The standard for effective withdrawal has been articulated by the Supreme Court: Affirmative acts

inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *Morton's Market v. Gustafson's Dairy*, 198 F.3d 823, 838 (11th Cir. 1999) citing *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *see also United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.1987). "This Circuit has a well-established, two-prong test for withdrawal: 'the defendant must prove [by a preponderance of evidence] that [1] he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and [2] either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities.'" *United States v. Bergman*, 852 F.3d 1046, 1062 (11th Cir. 2017) quoting *Finestone*, 816 F.2d at 589 (citations omitted).

Here, the evidence bears out Appellant Green's withdrawal from his dealings with Chambers at the time of Chambers' letter and that the third prong of admissibility under Rule 801(d)(2)(E) was not met by the Government. Appellant Green was in custody from March 2019 on and the Government cannot fairly assert additional contribution to Chambers' activities by Appellant Green after being taken into

custody.[16]  Appellant Green plainly met with the Government to share information regarding the prior activities of the parties that defeated the objectives of Chambers' conspiracy.  Chambers' letter was declared after these events and acknowledges that Appellant is no longer engaged with Chambers' plan.  The two prongs for withdrawal are plainly met by these facts.  As such, the inflammatory portions of Chambers' letter are not statements admissible against Appellant Green as a continuing member of an alleged conspiracy and are inadmissible hearsay.[17]  They do not constitute non-hearsay as a conspirator's statement in furtherance of a conspiracy Appellant Green was then engaged in and no hearsay exception otherwise saves their admissibility.

---

[16] Appellant Green acknowledges that in July 2022, after having been segregated away from Chambers and other possible G-side Gangster Disciples in the Gwinnett Detention Center for safety purposes following his arrest in March 2019 and subsequent proffers to the law enforcement officials, Federal officials temporarily detained him in a Federal holding facility with Chambers following their transfer from state to federal custody after the indictment on federal charges and was threatened by Chambers and Carlisle into putting his name on a renouncement of his interaction with law enforcement (Doc. 361- Pg.35), but submits the Government can offer no good faith basis for suggesting it was a genuine re-engagement with the Chambers' conspiracy.  Guidry also acknowledged that he and Appellant Green were threatened during their detention in Gwinnett for providing information to law enforcement.  (Doc. 361- Pg.32-33; Doc.339- Exh.6.)

[17] Appellant Green further asserts the circumstances suggest a lack of fundamental fairness under the Sixth Amendment if Chamber's letter is usable against him, in light of his withdrawal acts, as a consequence of Chambers penning the confessional details to a private citizen, but would not be admissible under *Bruton v. United States*, 391 U.S. 123 (1968) (whether Appellant Green withdrew or not) had Chambers handed, presented, or sent his letter to a law enforcement official.

Therefore, the admission of the inflammatory portions of the letter was error and, because those portions were needed to bolster equivocal testimony and statements from Guidry and Carlisle regarding Appellant Green, resulted in reversible error.

**IV.    The Government unlawfully introduced irrelevant and inflammatory evidence against Appellant Green; therefore, his conviction under Count One of the Indictment (RICO Conspiracy) should be overturned.**

The admission at trial of (1) a writing on notebook paper seized from Browner's vehicle upon her arrest (Doc. 341- Exh. 73, Pg. 2) and (2) evidence of ballistic vests and plates seized from Appellant Green's residence (Doc. 365- Pg. 84-86; Doc. 341- Exh. 217, 218, 225, 226) was improper over objection as to relevance under Federal Rule of Evidence 401 and unduly prejudicial under Rule 403.[18]  To support the admission of the items, they must be both relevant to an issue at hand and more probative than prejudicial; here, they were not.

---

[18] In addition to the argument presented here, Appellant Green argued at the trial level that the Government failed to meet the foundational requirements for the writing being admitted as a statement of a specified co-conspirator, but does not re-litigate that argument here.

"Rule 401 defines relevant evidence as having 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' Fed. Rule Evid. 401." *Old Chief v. United States*, 519 U.S. 172, 178, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

Under Rule 403, a trial court may exclude relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. Rule Evid. 403; *see also id*. at 180.

The challenged writing contains the words "E-team" at top and includes the names of Chambers, "Grip," and others in list form.  (Doc. 341- Exh. 73, Pg.2.)  There are other notations next names, including next to "Grip," for which no meaning can discerned.  *Id*.  The ballistic vests seized from Appellant Green's home are only mentioned in the trial evidence in relation to their seizure.    (Doc. 365- Pg. 84-85.)

It is the Government's assertion that the names on the challenged list are members of the G-side E-Team. (Doc. 365- Pg. 207.)  However, beyond the writing itself, which is not self-evident as to its meaning or purpose, no lawfully admissible

evidence exists to explain it.[19]  Everything else is pure conjecture without factual support.

Specifically, no witness testified to the jury as to when, how, or why it was created, or what the writing was.  Any number of speculations exist.  Was it roster?  Was it a meeting attendance sheet?  Was it a list of possible candidates?  Was it targets?  The writing addresses no time period.   On its face, how does it address racketeering activity alleged to be occurring in December 2018 and 2019?

In relation to the vests and plates, Appellant Green expects the Government to suggest they are relevant to showing Appellant Green's involvement with the G-side E-Team.  However, no other evidence was offered to connect the relationship between the items and the G-side E-Team.  No identification by someone that they were used in E-Team activities; no testimony that similar items were common to E-Team participants or that they were used in any predicate act alleged against Appellant Green.

---

[19]  Appellant Green acknowledges that Chambers' jailhouse letter addresses the writing and, if the jailhouse letter was admissible against him, the contested "E-Team" writing is more sustainable as potentially relevant; however, he maintains it is unduly prejudicial and potentially misleading concerning the material timeframe and also presents his relevance argument herein under the presumption the letter is deemed inadmissible.

Without additional information being presented at trial, neither challenged item make the existence of any consequential fact more probable; and, therefore, the items were incorrectly admitted irrelevant evidence.

However, even if the items offered some modicum of relevance on Appellant Green's participation in the E-Team, their scant relevance makes their admission more prejudicial than probative under Rule 403, and Appellant Green challenges the items as creating both unfair prejudice and misleading the jury.

While the balance is tilted toward admission, since exclusion under Rule 403 is an "extraordinary remedy," unfair prejudice occurs when the challenged evidence "lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180.  "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged, an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*.  "[Rule 403's] major function is to exclude "matter of scant or cumulative probative force, dragged in by the heels for the sake of prejudicial effect."  *United States v. Utter*, 97 F.3d 509, 514-515 (11th Cir. 1996).

In a similar vein, "misleading the jury" seemingly has a similar meaning, that the jury is lead to a decision of guilt based on evidence unrelated to the matters to be decided.

Here, Appellant Green is charged with conspiring in a RICO enterprise and specifically conspiring in the deaths of Ruff and Jackson as part of a RICO enterprise, the G-side division of the Gangster Disciples, of which the E-Team was a loosely described subgroup charged with enforcing G-side rules.  (Doc. 369- Pg. 122; Doc. 360- Pg. 150; Doc. 361- Pg. 102.).  Unfair prejudice exists in relation to the contested writing as it was offered to suggest Chamber's possession of the writing near in time to the alleged predicate acts shows an active connection between Appellant Green and the G-side E-Team at that time; yet no other specific evidence exists to show that to be case or that to be what the writing is.  It is also misleading as to the timing of the writing.

Unfair prejudice further exists in relation to the ballistic vests and plates, as they suggest some level of engagement in paramilitary violence; yet, no actual use of the vests is offered in relation to Appellant Green, the RICO enterprise, the G-side E-Team or the predicate acts alleged against him, merely the possession of the vests lures one into deeming Appellant Green to be engaged in unlawful violence, which is unfair and misleading.  Such items may be possessed and used in

perfectly legitimate security activities as a bouncer or security guard. The Government suggested Appellant Green was violent and used the vests and plates to sway the jury without context.

The challenged evidence should not have been admitted, and its admission unfairly prejudiced Appellant Green so egregiously that it created reversible error.

## **CONCLUSION**

For the above and foregoing reasons, Appellant Lesley C. Green respectfully requests this Honorable Court (1) to vacate the verdict on his RICO conspiracy charge under Count One of the Superseding Indictment against him, the verdict on Paragraphs 29 and 30 charging him with specific acts in furtherance of the RICO conspiracy that subjected him to enhanced sentencing, and the sentence in the district court below and (2) to remand his case to the district court for a new trial.

Respectfully submitted,

s/*M. Eric Eberhardt*
M. ERIC EBERHARDT
**EBERHARDT & HALE, LLP**
ATTORNEY FOR APPELLANT
LESLIE C. GREEN
STATE BAR NUMBER 238201

EBERHARDT & HALE, L.L.P.
1160 S. MILLEDGE AVENUE, SUITE 120
ATHENS, GEORGIA 30605
(706) 549-1965
(706) 549-5185 (FAX)

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed.R.App.P.32(a)(7), I certify that the number of words in this brief is less than the 13,000 allowed for criminal appellate briefs and, as counted by my word-processing system, is specifically believed to be 9,695 words.

s/*M. Eric Eberhardt*

M. ERIC EBERHARDT
ATTORNEY FOR APPELLANT
LESLIE C. GREEN

CERTIFICATE OF SERVICE

I, appellate counsel of record for Appellant Lesley C. Green, hereby certify that I have, on this 20th day of May, 2024, filed the foregoing *Brief of Appellant* with the Clerk of Court using the Eleventh Circuit's CM/ECF system, which will send electronic notification of filing to counsel of record.

I hereby further certify that I have, on the date set forth below, served a copy of the foregoing *Brief of Appellant* in paper format upon the following, by placing a copy of the same in the United States mail, postage prepaid, addressed to the following:

> Mr. Lesley C. Green-- 08345-510
> c/o USP POLLOCK
> U.S. PENITENTIARY
> P.O. BOX 2099
> POLLOCK, LA 71467

I further certify that, on the date set forth below, I caused four (4) copies of the foregoing Brief of Appellant in paper format to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

This the 20th day of May, 2024.

s/*M. Eric Eberhardt*
M. ERIC EBERHARDT
**EBERHARDT & HALE, LLP**
ATTORNEY FOR LESLEY C. GREEN